# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**ATTORNEY FOR APPELLANT**

J. Clayton Miller
Jordan Law, LLC
Richmond, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of H.R., Minor Child Alleged to be a Child in Need of Services; | July 22, 2019 |
| C.R. (Father), | Court of Appeals Case No. 19A-JC-144 |
| *Appellant-Respondent,* | Appeal from the Henry Circuit Court |
| v. | The Honorable Bob A. Witham, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 33C01-1807-JC-90 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

## Statement of the Case

C.R. ("Father") appeals the trial court's adjudication of his minor child, H.R. ("Child"), as a child in need of services ("CHINS") and the trial court's termination of his visitation with Child.[1] Father raises two issues for our review, which we restate as follows:

1.  Whether there was sufficient evidence to support the trial court's adjudication of Child as a CHINS.

2.  Whether the trial court denied Father his right to due process when it terminated his visitation with Child.

We affirm.

## Facts and Procedural History

Father and H.G. ("Mother") have one child together, Child, who was born on September 8, 2014. Beginning in January 2018, Father had sole custody of Child. On July 22, Child's adult half-sister, F.R. ("Sister"), picked Child up from Father. Father told Sister that Child "may have a yeast infection and that [Sister] need[s] to go get some medication for it." Tr. Vol. III at 92. The next day, Sister called Child's pediatrician, who called in a prescription for Child. Sister picked up the medication the following day, July 24.

Sister's wife, S.R., attempted to put the medication on Child. When Child saw that S.R. was about to put the medication on her, she "jumped backwards" and

---

[1] Child's mother does not participate in this appeal.

said, "no, no, no don't hurt me. I don't want it to go in my coochie like it does at daddy's house."[2] *Id.* Sister then asked Child what she meant, and Child said, "the white thing with the knot on the end, it goes in my coochie and it hurts me." *Id.* at 97.

[5] Sister then contacted Carrie Matthews, a family case manager ("FCM") with the Indiana Department of Child Services ("DCS"). Sister told FCM Matthews that Child "had told her that her dad had touched her in her vagina area[.]" Tr. Vol. II at 171. FCM Matthews recommended that Sister take Child to the pediatrician's office.

[6] Sister made an appointment for Child to see the doctor. Sister did not provide any information to the doctor's office about Child's allegations but, rather, made the appointment "for a checkup of the yeast infection." Tr. Vol. III at 122. On July 25, Sister took Child to the pediatrician's office, and FCM Matthews met them there. Once Sister and Child arrived, Amanda Witham, a medical assistant, conducted a clinical workup of Child. Child told Witham that she "was having burning," and she pointed "down to her vaginal area and toward her bottom or rectum." Tr. Vol. II at 79. Witham then talked to Child while they waited for the nurse practitioner to examine Child. Child told Witham that she "didn't want her daddy to put anything down there anymore and again pointed to her vaginal and anal area." *Id.*

---

[2] Child used the word "coochie" to refer to her "vaginal area." Tr. Vol. II at 196

[7] Based on Child's statements during the exam, FCM Matthews set up an appointment for Child to undergo a forensic interview. During the interview, the interviewer asked Child if anyone has ever touched her. Child told the interviewer that, sometimes before she goes to bed, "daddy puts a white ball thing in my coochie." Ex. 15. The interviewer then asked Child if the white thing did anything, and Child stated that it "was bobbing in [her] butt." *Id.* Child also stated that it "was beeping off and on." *Id.* Child further told the interviewer that, when Father "pressed a button," the white thing "went mmm." *Id.* Child then said that it "felt like brushing my teeth." *Id.* The interviewer then asked Child if she has an electric toothbrush, and Child stated that she does.

[8] Following Child's forensic interview, FCM Matthews scheduled an appointment for Holly Renz, a sexual assault nurse examiner, to examine Child the next day. Meanwhile, FCM Matthews contacted the Henry County Sheriff's Department and informed them of Child's allegations against Father. FCM Matthews then contacted Father and asked Father to go to the Sheriff's Department. Father complied, and officers interviewed him. Based on the interview and the information that the officers had received from DCS, Detective David Pierce obtained a warrant to search Father's house for "all vibrators, massagers, sex toys, [and] sexual devices, including a white in color vibrator or massager." Ex. at 14. Detective Pierce did not find any sex toys, but he found 196 grams of marijuana in jars that were in unlocked cabinets in various rooms of the house.

[9] On July 26, Renz examined Child. During the exam, Renz asked Child "if anyone had ever touched her coochie for no good reason." Tr. Vol. II at 197. Child told Renz that "her daddy had touched her coochie" with "the white thing." *Id*. Renz then asked Child if anyone had ever touched her butt for no good reason, and Child responded: "my daddy puts his finger in my butt." *Id*.

[10] That same day, DCS filed a petition alleging that Child is a CHINS. Specifically, DCS alleged that Father had "committed acts on [Child] that appear to be sexual acts involving a sexual aid" and that officers had located a large amount of marijuana in Father's house. Appellant's App. Vol. II at 17. DCS removed Child from Father and placed her with Sister. Thereafter, on August 1, the forensic interviewer conducted a second interview of Child. During that interview, Child told the interviewer that she had asked Father to throw the white thing away because "it hurts people." Ex. 15.

[11] On August 8, Father filed a request for parenting time, which the court denied. However, the court found that the issue "may be revisited following [C]hild's beginning of therapy and therapist's recommendation for visitation with [F]ather to commence." Appellant's App. Vol. II at 25. Father later requested that he be allowed to participate in visitation with Child. On September 12, the court approved Father's request for therapeutic visitation. But the court authorized the therapist "to terminate the visitation immediately" if "the visitation is deemed to be harmful to the [C]hild." *Id*. at 29.

[12] The trial court held a fact-finding hearing on the CHINS petition on October 3, October 29, and November 5. During the hearing, the State presented as evidence the testimony of Doctor Jason Cook, a clinical psychologist who had conducted an evaluation of Child to determine if Child would be emotionally or mentally harmed by testifying in court. Dr. Cook testified that, when he mentioned Father to Child, Child "had emotional reactions like arms flinging" and she became "agitated." Tr. Vol. II at 104. Dr. Cook specifically testified that Child would use her arms "as a weapon." *Id.* at 108. The State also presented as evidence the video recordings of Child's two forensic interviews. Father stipulated to the admission of the first interview, and the court admitted the video recording of the second interview without objection from Father.

[13] On October 19, Kaylee Durnell, Child's home-based therapist, wrote a letter in which she detailed her observations of Child. Specifically, Durnell observed that, during play therapy, Child engaged in "rigid play therapy" with themes that "allude to high anxiety and inability to manage anxious behaviors." Appellant's App. Vol. II at 33. Durnell further observed that the "introduction of a 'father role' during play stimulated anxious behavior" and that Child "will deflect, redirect, and flee when [Durnell] explores her relationships with her father." *Id.* Durnell stated that she is "extremely concerned" that Father had visitation with Child, and she asked the court to suspend visitation due to the "long lasting, traumatic impact face to face visitation" would cause Child. *Id.* at 34. Based on that letter, the State filed a motion to cease visitation between

Father and Child on October 31, after the second day of the fact-finding hearing but prior to the third day.

[14] At the start of the third and final day of the fact-finding hearing on November 5, the court asked counsel for the parties if they had any preliminary matters to discuss. DCS stated that it "ha[s] a motion with regard to visitation for later." Tr. Vol. III at 80. The court acknowledged DCS's motion and confirmed that it would discuss the motion, and Father did not raise any issues he had with DCS's motion at that time. The court then proceeded with the fact-finding hearing on the CHINS petition. Toward the end of the hearing, the State attempted to call Durnell as a rebuttal witness, but Father objected. Due to Father's objection, the court did not allow Durnell to testify "with respect to the Fact[-]Finding" hearing, but the court stated that it "will consider the report that she has filed on the Motion to Cease Visitation[.]" *Id*. at 144. At the conclusion of the hearing, the trial court took the State's petition alleging Child to be a CHINS under advisement, but the court granted the State's motion to cease visitation from the bench over Father's objection.

[15] Thereafter, the trial court entered findings of fact and conclusions thereon in which it adjudicated Child to be a CHINS. Specifically, the court found as follows:

> 1. [Child] made numerous statements to several persons regarding her father, [Father], touching her in an inappropriate manner on parts of her body, including her vagina and anus. Those statements were made to, or in the presence of, [Sister], [S.R.], Amanda Witham[,] and in two

(2) forensic interviews. . . . [Father] was the parent who had sole custody of [Child] prior to [Child] being removed from his custody on July 25, 2018.

2. From the evidence presented, the Court is convinced that something happened to [Child] and [Child] was subjected to inappropriate touching and [Father] was the person who was legally responsible for [Child]. Additionally, the Court notes that containers of marijuana were found in [Father's] home at around the time [Child] was removed from the home.

\* \* \*

4. Pursuant to Indiana Code [Section] 31-34-1-1, the evidence presented shows that [Child's] physical or mental health was seriously endangered by being inappropriately touched while in her father's custody and [F]ather has been unable, has refused[,] or has neglected to supply [Child] with necessary supervision. The Court believes that [Child] is in need of care, treatment, or rehabilitation that [Child] is not receiving and is unlikely to be provided or accepted without the coercive intervention of the Court.

Appellant's App. Vol. II at 36-37. On November 16, Father filed a motion to correct error. Father asserted that the trial court had violated his due process rights when it ceased his visitation with Child because the court granted the State's motion "without a contested hearing" and without Father "having an opportunity to cross-examine" Durnell. *Id.* at 40.

[16] On December 6, the court held a dispositional hearing and a hearing on Father's motion to correct error. During the hearing, Father stated that he "should be afforded the opportunity to at least cross-examine [Durnell] about

her findings[.]" Tr. Vol. III at 156. The court responded and stated that it "did not rely upon any of that information" when it granted DCS's motion to terminate Father's visitation. *Id*. at 156-57. Rather, the court stated that it had granted DCS's motion to cease visitation "based upon what the Court found in the Fact[-]Finding" hearing. *Id*. at 157. The court then denied Father's motion to correct error and issued its dispositional order in which it ordered Father to participate in services. This appeal ensued.

## Discussion and Decision

### *Issue One: Sufficiency of the Evidence*

[17]     Father first contends that there was insufficient evidence to sustain the trial court's determination that Child is a CHINS. Our Supreme Court recently reiterated our standard of review:

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id.* (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr. J. v. Ind. Dep't. of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

[18] DCS alleged that Child was a CHINS pursuant to Indiana Code Section 31-34-1-1 (2018), which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *J.B. v. Ind. Dep't. of Child. Serv. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[19] On appeal, Father asserts that there is insufficient evidence to support the trial court's findings. Specifically, Father asserts that the evidence does not support the findings because Child's statements were unreliable and, "[g]iven the unreliability of three-year-old [Child's] alleged disclosures (which are the only evidence whatsoever of alleged sexual abuse)," the evidence "does not reasonably lead to the conclusion [Child] was the subject of any sexual abuse."

Appellant's Br. at 18, 19. However, we agree with DCS that there is sufficient evidence to support the trial court's findings.

[20] It is well-established that the testimony of a child victim alone is sufficient to support a CHINS allegation. *See Rose v. State*, 36 N.E.3d 1055, 1061 (Ind. Ct. App. 2015) (stating that "a conviction for child molesting may rest solely on the uncorroborated testimony of the victim."). Here, the evidence demonstrates that, when S.R. attempted to apply medication to Child, Child "jumped backwards" and said, "don't hurt me. I don't want it to go in my coochie like it does at daddy's house." Tr. Vol. III at 92. Additionally, while at the pediatrician's office, Child told Witham that she "didn't want her daddy to put anything down there anymore" while pointing to her vaginal and anal area. *Id*. Further, during Child's first forensic interview, Child told the interviewer that "daddy puts a white ball thing in my coochie." Ex. 15. Child also told the interviewer that Father would "press[] a button" and it "went mmm" like her electric toothbrush. *Id*. And, during Renz's examination of her, Child told Renz that "her daddy had touched her coochie with a white thing" and that her "daddy puts his finger in [her] butt." Tr. Vol. II at 197. Father's contention on appeal, that Child's statements were unreliable, is merely a request for this Court to judge the credibility of the witnesses and to reweigh the evidence, which we cannot do. *See In re D.J.*, 68 N.E.2d at 577-78.

[21] The evidence supports the trial court's findings that Father's actions or inactions have seriously endangered Child, that Child's needs are unmet, and that those needs are unlikely to be met without State coercion. *See In re S.D.*, 2

N.E.3d at 1287. We therefore hold that sufficient evidence supports the trial court's findings, and its findings support its conclusions with respect to Indiana Code Section 31-34-1-1. We affirm the trial court's adjudication of Child as a CHINS.[3]

### Issue Two: Due Process

[22] Father next contends that the trial court violated his due process rights when it terminated his visitation with Child. It is well settled that "[d]ue process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *S.S. v. Ind. Dep't of Child Servs. (In re K.D.)*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). "Due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *S.C. v. Ind. Dep't of Child Servs. (In re L.C.)*, 23 N.E.3d 37, 40 (Ind. Ct. App. 2015) (quotation marks omitted).

[23] Father contends that he was denied his due process rights when the trial court "summarily granted" DCS's motion to cease visitation because the trial court "gave [Father] no opportunity to be heard" and because the trial court "did not give [Father] advanced notice of the basis [for] granting the motion[.]"

---

[3] In its findings of fact, the trial court also "note[d] that containers of marijuana were found in [Father's] home at around the time [Child] was removed from the home." Appellant's App. Vol. II at 37. However, the trial court only concluded that Child's physical or mental health was seriously endangered "by being inappropriately touched while in her father's custody." *Id.* Accordingly, while the trial court acknowledged that officers had found marijuana in Father's home, the trial court did not base its conclusion that Child is a CHINS on that finding of fact.

Appellant's Br. at 23. In essence, Father contends that the court violated his due process rights when it did not hold a separate hearing on the State's motion to cease visitation because he was not on notice that his visitation would be an issue during the CHINS fact-finding hearing. We cannot agree.

[24] DCS filed its petition alleging Child was a CHINS on July 26, 2018. In that petition, DCS alleged that Father had "committed acts on [Child] that appear to be sexual acts involving a sexual aid[.]" Appellant's App. Vol. II at 17. Given the specific allegations in that petition, Father was on notice that his visitation with Child would be at issue when the merits of that petition came before the court. That is to say, any reasonable parent who has been accused of sexual misconduct with his child would be aware of the fact that visitation with his child would be at issue during the CHINS proceedings.

[25] Further, prior to the fact-finding hearing on the CHINS petition, Father filed a request for visitation, which request the trial court granted. However, in its order granting Father's request, the court specifically authorized the therapist to terminate visitation immediately should the therapist deem visitation to be harmful to Child. Accordingly, in addition to being on notice that his visitation would be at issue based on the allegations in the CHINS petition, Father was additionally on notice from the date he received the court's order granting visitation that visitation could be terminated at any time.

[26] By the time the trial court held a three-day fact-finding hearing beginning on October 3, during which Father was represented by counsel, Father had clear

notice that his visitation with Child was at issue. And Father had ample opportunity to prepare for and present evidence at that hearing in support of his position that visitation should continue. Indeed, Father presented evidence during the fact-finding hearing to dispute DCS's allegations. Further, the trial court made its decision to terminate Father's visitation based only "upon what the Court found in the Fact[-]Finding" hearing. Tr. Vol. III at 197. Accordingly, even though the trial court did not hold a separate hearing to specifically address DCS's motion to cease visitation, Father "had the opportunity to be heard at a meaningful time and in a meaningful manner" on the issue of his visitation with Child. *In re K.D.*, 962 N.E.2d at 1257. Because Father had the opportunity to be heard, the trial court did not violate Father's due process rights, and we affirm the court's order ceasing visitation.

## *Conclusion*

In sum, DCS presented sufficient evidence to support the trial court's adjudication of Child as a CHINS. And the trial court did not violate Father's due process rights when it terminated Father's visitation with Child. We affirm the trial court.

Affirmed.

Baker, J., and Robb, J., concur.